**Fannie BROWN, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Oct. 10, 1969.

Rehearing Denied Feb. 27, 1970.

Marvin L. Henderson, Anthea May Boarman, Lexington, for appellant.

John B. Breckinridge, Atty. Gen., Joseph L. Famularo, Asst. Atty. Gen., Frankfort, for appellee.

EDWARD P. HILL, Jr., Chief Justice.

Appellant was convicted and given the maximum of 15 years under an indictment charging her with involuntary manslaughter. The indictment charged she "caused the death of William Turner by wanton in-

difference to the value of human life in the making and sale of a beverage known as 'heads,' against the peace and dignity of the Commonwealth of Kentucky." "Heads" is a concoction made by mixing harmless liquid with a paint thinner bearing the tradename "Thinz-All." Five errors are assigned in appellant's "Table of Contents and Authorities." We shall proceed to take up each one without listing them at this point; but before doing so, a brief outline of the facts may be helpful.

There was evidence introduced showing that on May 6, 1967, appellant asked a neighbor, Arthur Griffith, to drive her and her husband, R. B. Brown, to Glidden Paint and Hardware Company on Southland Drive in Lexington, Kentucky, which he did. Griffith testified appellant came out of the paint store with two or three cans of paint thinner.

Clifford Tehbadin, the Glidden store manager, testified he sold appellant three gallons of "Thinz-All" brand paint thinner on May 6, 1967.

Edward B. Ferrell testified that on this same date he and William Turner went to the residence of appellant to get "some drinks"; that Turner bought "some drinks," "heads"; that the appellant and her husband had three gallons of "the stuff"; that he told "R. B." in the presence of appellant that "he better watch the stuff," that he didn't know what it would do, but he knew it was dangerous from the experience (temporary blindness) he had had with it earlier; that William Turner drank "heads" purchased from appellant.

Ferrell also testified that on the following morning (May 7, 1967) he, William Turner, and Julius Day went back to appellant's place and got some drinks ("heads"), and he, Ferrell, drank some this time. Apparently at that very minute, R. B. Brown lay dead in the house, having died at "one minute after 6," at a time when Edward Greenleaf, his wife, and appellant were in the home observing that R. B. "just laid there and slept" and "didn't wake up."

Later on the same day (May 7, 1967) Ferrell and Turner were arrested and placed in the same jail cell. Early the following morning they became violently ill and were removed to Good Samaritan Hospital where Turner died in the emergency room.

Photographs of appellant's premises showed several empty cans with labels denoting various brands of paint thinner. Appellant was not in the painting business.

On May 10, 1967, an investigator purchased a gallon of "Thinz-All" paint thinner from Glidden of Southland Drive. There was a "skull and crossbones" on the container with the following admonition printed thereon: "Danger poison, vapors harmful, may be fatal or cause blindness if swallowed." A test of this material at the University Medical Center on May 12, 1967, showed that "Thinz-All" contained 74.4% methanol. Other competitive paint thinners were also analyzed, none of which were found to contain more than 2.84% methanol.

Dr. Wilmer M. Talbert, Jr., head of the Pathology Department at the University Medical Center, supervised the analysis of a blood sample taken from the body of William Turner a short time after his death and found that it contained "a lethal level of methyl alcohol."

Appellant did not testify in her case and declined to offer any evidence.

■ Appellant first argues that the trial court erred in "failing to grant" her motion for a change of venue.

Her motion was supported by the affidavits of three citizens and by numerous clippings from newspaper reports and editorials, the gist of which related to eight or ten deaths (including Turner's death) of persons from the vicinity of appellant's home, and all of which were the result of drinking "heads." The prosecution filed two counter-affidavits of local citizens.

The newspaper reports were published between May 9, 1967, and June 30, 1967.

A warrant was issued for appellant May 12, 1967, but she was not indicted until September 21, 1967. On January 31, 1968, the trial court overruled appellant's motion for a change of venue. The case was not tried until July 10, 1968, at which time appellant did not renew her motion for a change of venue or object to the commencement of the trial.

An application for change of venue and supporting evidence must relate to conditions existing at the time of trial. Howard v. Commonwealth, Ky., 395 S.W.2d 355 (1965), cert. denied 384 U.S. 995, 86 S.Ct. 1905, 16 L.Ed.2d 1012. In the Howard case, there was a lapse of less than seven months between the acts complained of and the date of trial, and there was a renewal made on the date of trial of the motion for change of venue. In the instant case, there was neither renewal of motion nor objection, and more than a year had passed when the trial started.

The question whether venue should be changed addresses itself to the sound discretion of the trial court. Kiper v. Commonwealth, Ky., 415 S.W.2d 92 (1967), and Smith v. Commonwealth, Ky., 366 S.W.2d 902 (1962).

Furthermore counsel asked prospective jurors if they had heard or read about the case. There was no response from any of the jurors when asked whether they had formed or expressed an opinion concerning the guilt or innocence of appellant. Appellant did not challenge for cause a single juror.

We conclude there is no merit in appellant's first argument that she was entitled to a change of venue.

Appellant next asserts that the evidence against her was purely circumstantial, for which reason she was entitled to a directed verdict of acquittal.

On this question the evidence was positive that appellant went to the paint store and purchased quite a quantity of paint thinner; that she personally sold drinks to Turner; that she had knowledge that it was dangerous from the label on the container and by the warning given to her by Ferrell; and that Turner's blood contained a "lethal" quantity of methyl alcohol.

The sufficiency of circumstantial evidence necessary to convict was recently discussed and defined in Cissell v. Commonwealth, Ky., 419 S.W.2d 555, 557, (1967), wherein the refined rule is stated in these words:

"'When the evidence, even though it be circumstantial, affords fair and reasonable ground upon which the verdict of a jury might be rested, the case should go to the jury. It is only where the testimony in behalf of the commonwealth fails to incriminate the accused, or is wholly insufficient to show guilt, that an accused is entitled to a peremptory instruction.'"

■■ Appellant's next point is that evidence of the contents of a blood sample taken from the body of Turner was incompetent for failure of the Commonwealth to show the "integrity" of the sample.

The evidence established that a deputy coroner took the blood sample, labeled it, placed it in a manila envelope, and delivered it to Coroner Hager, who in turn delivered it to "Mr. Cash" at the University of Kentucky Medical Center. Mr. Cash, under the direction and supervision of Dr. Wilmer M. Talbert, Jr., pathologist, made the analysis.

We cannot visualize any motive on the part of any of those who handled the blood sample to tamper with it. That there was any tampering is the barest speculation, which is not enough to destroy its integrity. People v. Riser, 47 Cal.2d 566, 572, 305 P. 2d 1.

The burden of the State to establish integrity is not absolute; all possibility of tampering need not be negatived, State v. Myers, 82 Ohio Law Abst. 216, 164 N.E.2d

585. See also McAllister v. State, 159 Tex. Cr.R. 57, 261 S.W.2d 332; Hoffman v. State, 160 Neb. 375, 70 N.W.2d 314; 21 A.L.R.2d 1216, and 3 A.L.R.2d Later Case Service 418, § 3 through § 6.

We find this argument without merit.

 Appellant's fourth argument is that she was prejudiced by failure of the trial court "to declare a mistrial and discharge the jury on the ground that repeated references were made by the prosecution to other deaths."

Appellant made timely objections to these references to other deaths, and the trial court sustained these objections. Also when appellant sought an admonition, one was given. Appellant was apparently satisfied by the action of the trial court in that she made no motion to declare a mistrial or to discharge the jury. There was no error. Taylor v. Commonwealth, Ky., 386 S.W.2d 716 (1966); RCr 9.24 and 9.26; also Taylor v. Commonwealth, Ky., 432 S. W.2d 805 (1968); and RCr 9.22.

The final argument is that the "trial court committed reversible error in failing to discharge the jury after improper argument of counsel as to status of appellant as accessory."

In his closing argument, the Commonwealth's Attorney made this statement: "About the only two things I can agree with wholeheartedly with counsel for the defense is the statement that if Robert Brown were living, yes, he would be jointly indicted with this woman if he were living, but the fact that he is dead does not make her participation, does not make her less guilty because somebody else with her helped her and she helped him in bringing about this crime." Objection was promptly made by counsel for appellant with a motion to admonish the jury with respect to the argument. The trial court said: "There's no question about accomplice in this case to be submitted to the jury. It's just a question of whether the defendant com-

mitted this offense herself, and that is what the Court instructed on, and the jury will not consider it."

Appellant said nothing more. No motion was made for a mistrial.

Appellant is in the same posture with her final argument as we found her in her fourth argument, and the authorities hereinbefore cited apply here.

The judgment is affirmed.

All concur.