# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: SEPTEMBER 26, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0316-MR

KENNETH BRYAN GRUBB                       APPELLANT

V.                    ON APPEAL FROM CLAY CIRCUIT COURT
HONORABLE OSCAR G. HOUSE, JUDGE
NO. 17-CR-00069

COMMONWEALTH OF KENTUCKY           APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Kenneth Bryan Grubb was convicted by a Clay County jury of murder, tampering with physical evidence, and unauthorized use of a vehicle. He received a total sentence of 25 years' imprisonment and appeals to this Court as a matter of right.[1] Following a careful review, we affirm.

**FACTS AND PROCEDURAL HISTORY**

Grubb and Robert Burns were longtime acquaintances and neighbors. On April 27, 2017, Grubb shot and killed Burns inside Grubb's home. Grubb wrapped Burns in bedding material and plastic before placing the body in Burns's Chevrolet Trailblazer which Grubb proceeded to drive to an isolated location on property owned by Grubb's father. He placed Burns's body under a

---

[1] KY. CONST. §110(2)(b).

large tarp which he secured with a tire. Grubb continued to use Burns's vehicle as his own until he abandoned it by the side of the road on May 1, 2017.

On the same day, Trooper Josh Wilson responded to a report that Burns was missing. While traveling to Burns's residence, Trooper Wilson noticed a Trailblazer on the side of the road, partially blocking traffic. At this time, Trooper Wilson did not make any connection between the vehicle and his investigation. After having the vehicle towed, Trooper Wilson proceeded to Burns's residence where he did not observe anything out of the ordinary.

The next day, Trooper Wilson returned to Burns's residence and encountered Jim Combs who was also looking for Burns. Eventually, Trooper Wilson entered the residence with Combs's assistance and discovered the entire house had been ransacked. A large gun safe was turned over on the floor and covered with tool marks as if someone had attempted to open it without a key.

Trooper Wilson later connected the towed Trailblazer to Burns. He also recalled encountering Grubb with the vehicle on May 1, 2017, prior to receiving the missing person report, when Grubb had flagged him down to ask for directions. At this point, Grubb became a person of interest in Burns's disappearance.

On May 4, 2017, Trooper Jarrod Smith attempted to locate Grubb at a mobile home where Grubb was known to have previously resided. When Trooper Smith arrived at the trailer, he immediately noticed the odor of

2

"something that appeared to be dead." About 100 feet from the trailer, Trooper Smith and Trooper Logan Howe, discovered a badly decomposed body under a tarp, which was later identified as Burns. Near the body, the Troopers found what they believed to be a homemade silencer, consisting of a pillow, a bungee cord, and a soda bottle.

Grubb was eventually located in Ohio and arrested on May 20, 2017. He was charged with murder, tampering with physical evidence, theft by unlawful taking, and unauthorized use of a motor vehicle.[2] Grubb testified at trial and claimed self-defense.

According to Grubb, Burns arrived at his residence in possession of two pistols, a revolver, and a shotgun.[3] Burns was acting very erratically; pacing, peering out windows, and rummaging through Grubb's drawers. Grubb believed Burns to be under the influence of methamphetamine.[4] When Grubb eventually demanded Burns to leave his house, Burns refused and pointed a pistol at him.

Grubb raised his hands and backed away from Burns. As Burns turned to walk away, Grubb grabbed Burns's shotgun which was laying nearby and again asked him to leave. Burns did not respond and raised his pistol again at which time Grubb shot him. After Burns fell backward onto a mattress, he

---

[2] The theft by unlawful taking charge was later dismissed.

[3] Grubb claimed to have sold this shotgun to Burns approximately a week prior to the shooting.

[4] Grubb admitted to being under the influence of pain medication and alcohol at the time but denied using methamphetamine.

3

raised his pistol again at which time Grubb shot Burns a second time in the face.

Grubb explained that he did not alert the authorities of Burns's death because he "wasn't raised that you call the law" and he was afraid no one would believe him. After disposing of Burns's body, Grubb loaded his own property in Burns's vehicle intending to flee the area. He admitted he knew law enforcement was looking for him and he was trying to hide. Grubb eventually abandoned Burns's vehicle and was driven to Ohio by an unnamed individual. During the journey, Grubb threw the shotgun he used to kill Burns, along with Burns's other guns, into the Ohio River because he "wasn't going to be caught with those guns."

The jury did not accept Grubb's claim of self-defense and found him guilty of murder, tampering with physical evidence, and unauthorized use of a motor vehicle. The trial court sentenced Grubb to 25 years' imprisonment in accordance with the jury's recommendation. This appeal followed.

## LAW AND ANALYSIS

### 1. Grubb was not entitled to a no-duty-to-retreat instruction.

Grubb first argues he was entitled to a no-duty-to-retreat instruction. He properly preserved this issue by tendering an instruction which substantially mirrored KRS[5] 503.055(3). The trial court acknowledged Grubb's

---

[5] Kentucky Revised Statutes.

4

request and denied it on the record but did not articulate the basis of the ruling.

RCr[6] 9.54(1) imposes a duty upon the trial court "to instruct the jury in writing on the law of the case[.]" The law of the case encompasses both lesser-included offenses and any available affirmative defenses. *King v. Commonwealth*, 513 S.W.3d 919, 923 (Ky. 2017). Thus, "[t]he jury **instructions must be** complete and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper **instructions**." *Hayes v. Commonwealth*, 870 S.W.2d 786, 788 (Ky. 1993).

KRS 503.055(3) codifies Kentucky's traditional no-duty-to-retreat rule[7] and states:

> A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

The plain language of "KRS 503.055(3) requires both that a defendant is 'not engaged in unlawful activity' and 'is attacked in any other place where he or she has a right to be' before the provisions of that statute apply." *Curry v. Commonwealth*, 620 S.W.3d 563, 569 (Ky. 2020). In *Curry*, we held "the fact

---

[6] Kentucky Rules of Criminal Procedure.

[7] In *Gibson v. Commonwealth*, 237 Ky. 33, 34 S.W.2d 936 (1931), our predecessor Court observed, "It is the tradition that a Kentuckian never runs. He does not have to."

that a criminal defendant is entitled to a jury instruction on self-defense does not automatically entitle him to an additional instruction on no duty to retreat." *Id.* at 568. The additional no-duty-to-retreat instruction is available

> only in such situations where evidence of an apparent means of retreat is so intertwined in the evidence in the case that the trial court should give an appropriate no-duty-to-retreat instruction based on KRS 503.055(3). This is because so doing prevents the jury from improperly considering the available means of retreat, or the defendant's knowledge of the available means, as evidence that the use of force was not reasonably necessary or that the defendant did not subjectively believe that the use force was necessary. But when there is no such risk, because the jury is not presented with any such evidence to improperly consider, there is no need to give the instruction.

*Id.* (quoting *Ragland v. Commonwealth,* 476 S.W.3d 236, 244 (Ky. 2015)). The essential inquiry in determining the availability of a no-duty-to-retreat instruction is

> whether there was evidence of an available route for retreat or other opportunity to altogether avoid the confrontation that was so intertwined in the evidence that it makes it more logical to give a no duty to retreat instruction because the jury might have improperly considered the means of retreat as evidence that [the defendant's] use of force was not reasonably necessary or that [the defendant] did not subjectively believe that use of force was necessary.

*Id.*

We cannot conclude evidence of an apparent means of retreat was so inextricably intertwined with the facts of this case to create a risk of jury confusion as to Grubb's subjective belief that the use of deadly force was reasonably necessary. Contrary to the facts in *Curry,* here, the Commonwealth did not pursue any questioning or argument concerning Grubb's ability to avoid the confrontation with Burns. The Commonwealth's

6

theory of the case centered primarily on the argument that Grubb's flight and efforts at concealment were wholly inconsistent with a claim of self-defense. Thus, the Commonwealth did not invite the jury to discredit Grubb's claim of ordinary self-defense based on the possibility of retreat.

For his part, Grubb points to his own testimony on direct examination that he did not call 911 or otherwise attempt to flee because he did not want to be forced from his own house. While a defendant's own testimony may generally provide sufficient evidence to warrant an instruction on an affirmative defense because the pertinent question is "whether the evidence would permit a reasonable juror to make the finding the instruction authorizes[,]" *Allen v. Commonwealth*, 338 S.W.3d 252, 255 n.1 (Ky. 2011), the relevant inquiry, in the context of a no-duty-to-retreat instruction, is not simply whether sufficient evidence of a claimed defense exists, but whether the evidence of available retreat is so inextricably intertwined with the other evidence so as to create the risk of jury confusion on the issue of the defendant's state of mind relative to his or her claim of self-defense. *Curry*, 620 S.W.3d at 568.

Moreover, we cannot consider the availability of an instruction based on a single statement in isolation. *Gribbins v. Commonwealth*, 483 S.W.3d 370, 375-76 (Ky. 2016). Rather, our determination must be based on the evidence as a whole and the arguments of counsel. *Id.* Although Grubb testified Burns was under the influence of methamphetamine, he also claimed he had known Burns since he was a child and that they had no history of serious conflict.

7

According to Grubb, the deadly confrontation occurred abruptly when Burns raised a pistol after Grubb demanded that he leave. At this moment, Grubb stated he believed Burns would kill him. Rather than undermining his theory of self-defense, Grubb's testimony reinforced his contention that he believed he had no choice but to use deadly force. The sudden and unforeseeable escalation of the situation forecloses any reasonable inference that retreat was a viable option. *See Curry*, 620 S.W.3d at 571 ("The homeowner, in all likelihood, could not have foreseen his home being burglarized, let alone have an opportunity to leave the home prior to the break in to avoid shooting the burglar."). Under these circumstances, we do not perceive a substantial risk the jury would improperly consider evidence of retreat in determining Grubb's mental state.

Further, we discern no merit in Grubb's assertion that the jury would "surely assume" he would have knowledge of the available means of retreat in his own home. The availability of the no-duty-to-retreat instruction is not premised on speculation or assumption. Instead, the standard is whether *evidence* of the opportunity to retreat is inextricably intertwined with the other evidence so as to create the risk the jury would misuse the retreat evidence in determining the defendant's mental state regarding the necessity of deadly force. *Curry*, 620 S.W.3d at 568.

Grubb additionally requests this Court to revisit *Curry* to the extent it held that "being a felon in possession of a firearm is an unlawful activity for the purposes of determining a defendant's entitlement to a no duty to retreat

8

instruction." *Id.* at 570. Because the evidence in the present matter does not support a no-duty-to-retreat instruction irrespective of Grubb's status as a convicted felon, we decline to reconsider our decision in *Curry*. Similarly, we need not address Grubb's alternative argument that the denial of a no-duty-to-retreat instruction based solely on his status as a convicted felon in possession of a firearm violates the Second Amendment of the United States Constitution. Again, Grubb was not entitled to the instruction regardless of his status as a convicted felon. Under the doctrine of constitutional avoidance, courts should refrain from deciding constitutional questions unless absolutely necessary.[8] *Baker v. Fletcher*, 204 S.W.3d 589, 597-98 (Ky. 2006).

### 2. Admission of improper character evidence was harmless.

Grubb next argues the trial court erred by allowing improper character evidence in violation of KRE[9] 404(b). Specifically, he argues his ex-girlfriend, Casey Smith, should not have been permitted to testify that she broke up with him because he was abusive.

The general rule is well-established "that evidence of other crimes is not admissible to show that a defendant is a person of criminal disposition." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 333 (Ky. 2023) (citing KRE 404(a)). However, such evidence may be admissible when offered for a purpose other than criminal predisposition "such as proof of motive,

---

[8] Because we do not reach the constitutional question, we need not resolve the parties' dispute concerning preliminary issues of proper preservation and adequate notice to the Attorney General.

[9] Kentucky Rules of Evidence.

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or . . . [i]f so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(1)-(2). "The admissibility of evidence under KRE 404(b) is evaluated under a three-part test: (1) relevance; (2) probativeness; and (3) prejudicial effect." *Gasaway*, 671 S.W.3d at 334. We review evidentiary rulings under KRE 404(b) for abuse of discretion. *Id.* An abuse of discretion occurs when "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

In the present appeal, the Commonwealth did not provide any notice of its intent to introduce evidence of prior bad acts as required by KRE 404(c). Prior to trial, the court granted Grubb's motion to exclude any evidence of prior bad acts based on lack of notice.

The Commonwealth called Smith during its case-in-chief. She testified that she resided with Grubb and that neither were employed at the time. Smith confirmed Grubb and Burns were friends and that Burns drove a Trailblazer. She stated that she and Grubb broke up at the end of April 2017, around the time of the events in question. When the Commonwealth asked her why they parted ways, Smith responded, "To be honest, he was kind of abusive." The trial court overruled Grubb's objection to this testimony. The Commonwealth subsequently continued to examine Smith regarding Grubb's

10

possession of firearms and other matters but did not return to the issue of abuse.

We cannot accept the Commonwealth's contention that Smith's testimony was properly admissible merely because it did not anticipate her answer and, thus, did not subjectively intend to elicit evidence of prior bad acts. Kentucky law is clear that the admissibility of evidence under KRE 404(b) depends on the three-part test comprising relevance, probativeness, and prejudicial effect. *Gasaway*, 671 S.W.3d at 334. Applying this test to the present matter, we have little difficulty concluding the evidence was admitted in error. This Court has consistently held "evidence of prior threats and animosity of the defendant against the victim is admissible as evidence of motive, intent or identity whereas *evidence of prior threats or violence against an unrelated third-party is generally regarded as inadmissible character evidence*[.]" *Davis v. Commonwealth*, 147 S.W.3d 709, 722 (Ky. 2004) (internal citations omitted) (emphasis added). However, our determination of error does not end the analysis.

RCr 9.24 provides "[n]o error in . . . the admission . . . of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice." Harmless error analysis applies to nonconstitutional evidentiary missteps not affecting substantial rights of the parties. *Murray v. Commonwealth*, 399 S.W.3d 398, 404 (Ky. 2013) (citing *Kotteakos v. United*

11

*States*, 328 U.S. 750 (1946)). "The test for harmless error is whether there is any substantial possibility that the outcome of the case would have been different without the presence of that error." *Exantus v. Commonwealth*, 612 S.W.3d 871, 890 (Ky. 2020) (quoting *Thacker v. Commonwealth*, 194 S.W.3d 287, 291 (Ky. 2006)).

We do not discern any substantial possibility that Smith's improper testimony changed the outcome of this case. By Grubb's own admission, he did not report the shooting; appropriated Burns's vehicle; disposed of Burns's body and the weapon involved in the killing; and fled Kentucky despite actual knowledge the police were searching for him. It is well-established that "[f]light and attempt at concealment are circumstantial evidence of guilt because they suggest a guilty state of mind." *Welborn v. Commonwealth*, 157 S.W.3d 608, 615 (Ky. 2005). Smith's fleeting remark concerning prior abuse simply has no bearing on the evidence of Grubb's conduct following the shooting which was strongly inconsistent with his claim of self-defense. Therefore, we conclude the error was harmless.

### 3. Admission of improper hearsay evidence was harmless.

For his third contention of error, Grubb argues the trial court erred by admitting hearsay evidence. Specifically, he argues David Feldman should not have been permitted to testify that he had "been hearing a lot about how" Grubb killed Burns and that Grubb had been seen driving Burns's vehicle. We agree this evidence was improper but deem the error to have been harmless.

12

KRE 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay evidence is not admissible unless it falls into a specific exception as provided by the Rules of Evidence or the Rules established by this Court. KRE 802.

The Commonwealth concedes Feldman's testimony was inadmissible hearsay and contends the error was harmless. We fail to discern any risk the admission of this testimony changed the outcome of the case in light of Grubb's own admission that he killed Burns and drove Burns's vehicle after the killing. *Exantus*, 612 S.W.3d at 890.

**4. Any error in admission of DNA evidence was harmless.**

For his final contention of error, Grubb argues the trial court erred by allowing the admission of certain DNA evidence for lack of a proper foundation. We perceive any error in this regard to have been harmless.

When a party seeks to admit real, physical evidence, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a). In other words, "a proper foundation requires the proponent to prove that the proffered evidence was the same evidence actually involved in the event in question and that it remains materially unchanged from the time of the event until its admission." *Ross v. Commonwealth*, 455 S.W.3d 899, 912 (Ky. 2015) (quoting *Thomas v. Commonwealth*, 153 S.W.3d 772, 779 (Ky. 2004)). Our precedents require "[a]

13

stronger foundational showing [as] a prerequisite to [the] admission of substances that are fungible and not as readily distinguishable; but it remains 'unnecessary to establish a perfect chain of custody or to eliminate all possibility of tampering or misidentification.'" *Id.* (quoting *Rabovsky v. Commonwealth*, 973 S.W.2d 6, 8 (Ky. 1998)). "Instead, the proponent need only show that 'the reasonable probability is that the evidence has not been altered in any material respect.'" *Id.*

During its case-in-chief, the Commonwealth introduced testimony from Brigette Holbrook, a forensic scientist employed by the Kentucky State Police (KSP), concerning DNA testing she had performed on several items as part of the investigation of this case. Grubb objected to her testimony regarding DNA testing performed on a portion of Burns's femur bone because Holbrook admitted she did not personally perform the testing on that item. Instead, she explained she outsourced the testing to a DNA laboratory in Florida because the KSP laboratory lacked the capability to extract DNA from a bone at that time. The trial court overruled the objection on the basis that Grubb had requested the DNA testing at issue. Holbrook was then permitted to compare the DNA extracted from Burns's femur to DNA profiles she obtained from Grubb's residence and Burns's vehicle.

We need not resolve the disputed issues relative to authentication and the proper chain of custody because we do not discern any resulting prejudice. Here, the purpose of the contested DNA evidence was to substantiate the Commonwealth's theory that Burns's DNA was present in Grubb's residence

14

and inside Burns's vehicle.  Because Grubb admitted to killing Burns in his residence before placing the body in Burns's vehicle, we fail to perceive any substantial risk the admission of the DNA affected the outcome of the case. *Exantus*, 612 S.W.3d at 890.  Therefore, the error, if any, was harmless.

## CONCLUSION

For the foregoing reasons, the judgment of the Clay Circuit Court is affirmed.

All sitting.  VanMeter, C.J.; Bisig, Conley, Keller, Lambert, Nickell JJ., concur. Nickell, J., concurs by separate opinion in which Keller, J., joins. Thompson, J., concurs in result only.

NICKELL, J., CONCURRING:  I fully concur with the majority opinion and agree the no-duty-to-retreat issue may be properly resolved without reference to Grubb's status as a convicted felon.  However, I continue to adhere to the views expressed by Justice Keller in her separate opinion in *Curry* and remain unconvinced that being a felon in possession of a firearm ("felon-in-possession") is necessarily a strict liability offense.  In my estimation, the avoidance defense of duress under KRS 501.090 and the justification defense of necessity under KRE 503.030 are available to a felon-in-possession such that a convicted felon may be entitled to a no-duty-to-retreat instruction in the appropriate case.[10]

---

[10] Unlike many jurisdictions which have merged the concepts of duress and necessity, Kentucky law maintains the traditional distinction between these defenses in criminal cases. *Bates v. Commonwealth*, 145 S.W.3d 845, 846 (Ky. App. 2004) (comparing KRS 501.090 and KRS 503.030).  The defense of duress is "is best viewed as an excuse because the compulsion imposed by the third party compromises the

15

This position is further buttressed by the broad application of justification defenses to felon-in-possession charges in federal court. *United States v. Leahy*, 473 F.3d 401, 407 (1st Cir. 2007) (holding the common-law defenses of duress, necessity and self-defense are available "in a federal felon-in-possession case, under a single, unitary rubric: justification."); *United States v. Perez*, 86 F.3d 735, 737 (7th Cir. 1996) (explaining "[t]he defense of necessity will rarely lie in a felon-in-possession case unless the ex-felon, not being engaged in criminal activity, does nothing more than grab a gun with which he or another is being threatened (the other might be the possessor of the gun, threatening suicide)."); *United States v. Newcomb*, 6 F.3d 1129, 1135 (6th Cir. 1993) (holding justification defenses apply to felon-in-possession cases and observing "[c]onduct should be deemed justified when it is an emergency measure necessary to avoid an imminent injury . . ."). Therefore, I believe the holding of *Curry* relative to unlawful activity under KRE 503.055(3) deserves future reconsideration, especially in light of the recent sea change in Second Amendment jurisprudence under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). With this understanding, I concur.

Keller, J., joins.

---

autonomy of the actor and negates their culpability." Jens David Ohlin, 1 *Wharton's Criminal Law* § 15:7 (16th ed.). On the other hand, necessity is a true justification defense "because the defendant's selection of the lesser evil negates the wrongfulness of the unlawful act." 1 *Wharton's* at § 15:1.

COUNSEL FOR APPELLANT:

Stefan J. Bing
Sonam A. Hira
GESS MATTINGLY & ATCHISON, P.S.C.


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General