Christopher LOVE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 1999–SC–0639–MR.

Supreme Court of Kentucky.

Feb. 22, 2001.

Rehearing Denied Oct. 25, 2001.

Emily Holt, Department of Public Advocacy, Frankfort, Counsel for Appellant.

A.B. Chandler, III, Attorney General, Samuel J. Floyd, Jr., Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

COOPER, Justice.

In the early morning hours of December 13, 1997, a three-car accident on Louisville's eastbound Watterson Expressway claimed the lives of two individuals and injured seven others. A jury convicted Appellant, Christopher Love, of two counts of wanton murder, two counts of assault in the first degree, one count of assault in the third degree, four counts of assault in the fourth degree, and one count each of operating a motor vehicle with a suspended operator's license and operating a motor vehicle while under the influence of alcohol. He was sentenced to prison for twenty years and appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

At 2:21 a.m. on December 13, 1997, a Chrysler Laser, driven by William Shaw, merged onto the eastbound lanes of Watterson Expressway from the northbound lanes of Dixie Highway. Shaw, drunk and on methamphetamines and amphetamines, failed to notice a Ford Aerostar minivan, driven by Clark Vinson, and prematurely

merged over the raised median. The collision caused the minivan to flip three times and land on its passenger side, perpendicular to the Watterson, with its nose facing the barrier wall. Vinson was ejected through the front windshield and onto the highway. Shaw's vehicle struck the barrier wall, flattened its left side tires, and rolled to a stop further down the expressway.

At the site of the accident, eastbound Watterson is a three-lane highway for through traffic divided by white intermittent lines. A small hill lies to the west of the scene. An emergency lane borders the left lane, with a concrete barrier wall dividing the emergency lane from westbound traffic. To the right of the through lanes, a raised median separates the entrance ramp from Dixie Highway to the Watterson. The posted speed limit is 55 miles per hour.

Immediately after the accident, occupants of several eastbound vehicles stopped to render assistance. David Morrison parked his tractor-trailer rig between Vinson's minivan and Shaw's Chrysler and started placing red warning triangles on the road. A group of Fort Knox soldiers, including Christopher Ochs, also stopped to render aid. At 2:23 a.m., Shively police arrived on the scene in two cruisers. They parked one cruiser to block the entrance ramp from Dixie Highway and the other to block the left and center lanes of the Watterson. Two of the officers went to aid Vinson who was conscious but so seriously injured that the officers radioed for a helicopter to transport him to a hospital. A third officer, cadet Clark, had been instructed to move his cruiser from the entrance ramp to further west on the Watterson to provide additional warning time for motorists topping the rise above the accident.

At 2:26 a.m., Appellant Love crested the hill in his Ford Thunderbird and approached the accident scene at a high rate of speed. Eyewitnesses estimated Appellant's speed at seventy to ninety miles per hour. Appellant successfully swerved to miss the police cruiser partially blocking the left two lanes, but struck the minivan, flipping it onto Vinson and killing him instantly. The Thunderbird then struck soldier Christopher Ochs, who also died instantly. Six other bystanders, including two police officers, were injured as a result of being struck by the Thunderbird, the minivan, or debris. The Thunderbird then careened off of the tractor-trailer rig and crashed perpendicularly into the barrier wall, injuring both Appellant and his passenger, Kimberly Morris.

There were no skid marks at the scene attributable to the Thunderbird. No one saw any brake lights on the Thunderbird as it swerved around the police cruiser. Four unopened and two opened beer cans were found inside the Thunderbird. Emergency medical service personnel testified that Appellant smelled of alcohol. Appellant admitted to drinking eight beers that night. At the hospital, Appellant refused to cooperate with police or hospital staff. The hospital, following its own procedures, placed Appellant in four-point restraints and drew a blood sample at 4:25 a.m. Results from testing Appellant's blood serum revealed a blood alcohol concentration (BAC) of 0.241%. At 6:15 a.m. additional blood was drawn from Appellant pursuant to a search warrant. KRS 189A.105(2)(b). Results from testing that sample revealed a BAC some four hours after the accident of 0.17%.

## I.  ADMISSION OF THE POLICE BLOOD AND URINE TEST.

Pursuant to the search warrant, the police drew a sample of blood and

collected a urine specimen to determine if Appellant was intoxicated at the time of the accident. The trial judge overruled Appellant's pretrial motion to suppress the results of tests on these samples and allowed the Commonwealth to introduce that evidence at trial. Appellant claims error because too much time elapsed between the accident and the collection of the blood sample. Additionally, he argues that the admission of the results of the urine test was error as driving under the influence in Kentucky is measured through breath or blood, not urine. He further alleges that the trial court impermissibly allowed the Commonwealth to use the various tests to extrapolate Appellant's blood alcohol level at the time of the accident.

At the time of Appellant's prosecution. KRS 189A.010(1) stated in pertinent part:

A person shall not operate or be in physical control of a motor vehicle anywhere in this state:

(a) While the alcohol concentration in his blood or breath is 0.10 or more based on the definition of alcohol concentration in KRS 189A.005;

(b) While under the influence of alcohol.

Appellant asserts that the four hours between the accident (when he was last operating a motor vehicle) and the collection of his blood sample represents too great a lapse of time to prove he was intoxicated while operating a motor vehicle. In *Commonwealth v. Wirth*, Ky., 936 S.W.2d 78 (1996), we specifically declined to adopt a bright line rule with respect to "when the lapse of time between driving and testing for alcohol intoxication becomes so great as to prevent a rational trier of fact from determining guilt based thereon." *Id.* at 84. Our views in that regard have not changed. Furthermore, nothing in the record indicates a reason to distrust these results. Hospital staff closely monitored

Appellant from the moment he entered the emergency room. He had no opportunity to ingest additional alcoholic beverages so as to skew the test results. In fact, the delay benefitted Appellant by providing more time for his body to oxidize the alcohol in his system. The test results were properly admitted.

■ Nor was it error to admit the results of the urinalysis. KRS 189A.005(1) defines "alcohol concentration," the key term in finding a driver in violation of KRS 189A.010(1)(a), in terms of milliliters of blood or liters of breath. Appellant argues that since the definition does not include urine, it was error to admit the urine sample test results. However, the failure of KRS 189A.005(1) to mention urine does not affect the admissibility of urine sample evidence to prove guilt under KRS 189A.010(1)(b). We need not decide whether a jury could convict Appellant of violating the "per se" section of the statute, KRS 189A.010(1)(a), based on the results of a test of his urine sample; for this evidence was relevant in determining whether he was guilty of violating the "under the influence" section of the statute, KRS 189A.010(1)(b). The jury was instructed on both statutory bases of guilt. We also note that urine tests are contemplated by KRS 189A.103(1), (3), and (5).

■ Appellant's contention that the Commonwealth impermissibly used the various tests to extrapolate his BAC at the time of the accident is also without merit. In *Wirth, supra,* this Court stated "[e]xtrapolation evidence is not *required* for the Commonwealth to make a prima facie case of a [violation of KRS 189A.010(1)(a) ]." *Id.* at 84 (emphasis added). However, nothing in this wording precludes the Commonwealth, or the defendant, from using extrapolation evidence to assist the trier of fact in its determinations.

## II. THE BLOOD SERUM.

Before the Louisville police obtained the search warrant to procure the blood and urine samples, the hospital drew blood from Appellant pursuant to hospital procedures. This occurred at 4:25 a.m. An employee then centrifuged the sample precipitating the solid portion of the blood from the liquid portion (the serum). A lab technician then tested the blood serum for the presence of alcohol or drugs. The results, recorded at 5:40 a.m., revealed a BAC of 0.24%. Appellant raises four claims of error concerning the testing of his blood serum.

### A. Chain of Custody.

■ Appellant alleges error because the Commonwealth failed to prove a complete chain of custody with respect to the centrifuge process. At trial, the phlebotomist who drew the blood and the lab technician who performed the actual testing testified as to the chain of custody. The only absent member of the chain of custody was the technician who centrifuged the sample. However, the technician who performed the testing further testified that in the centrifuge process the tube containing the sample is placed unopened in the centrifuge and spun down. Once complete, the tube is given to the testing technician, who is the first to open the sealed sample.

In *Rabovsky v. Commonwealth*, Ky., 973 S.W.2d 6 (1998), we thoroughly analyzed chain of custody law in Kentucky. As to blood, the chain of custody ensures that the sample tested was the same sample drawn from the individual. R. Lawson, *The Kentucky Evidence Law Handbook*, § 11.00, p. 592 (3rd ed. Michie 1993). However, "[e]ven with respect to substances which are not clearly identifiable or distinguishable [like blood], it is unnecessary to establish a perfect chain of custody or to eliminate all possibility of tampering or misidentification, so long as there is

persuasive evidence that 'the reasonable probability is that the evidence has not been altered in any material aspect.'" *Rabovsky, supra*, at 8 (quoting *United States v. Cardenas*, 864 F.2d 1528, 1532 (10th Cir.1989), *cert. denied*, 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989)). Important to the present matter, *Rabovsky* also held that "[g]aps in the chain normally go to the weight of the evidence rather than its admissibility." *Id.* at 8; *see also United States v. Lott*, 854 F.2d 244, 250 (7th Cir.1988).

Under these standards, the trial judge properly admitted the blood serum test results. The record contains "persuasive evidence" that Appellant's sample was tamper free, as the testimony of the lab technician who performed the test proved that the sample remained sealed during the centrifuge process. It was for the jury to decide the weight to be given to the blood serum evidence.

### B. Blood Serum versus Whole Blood.

■ Blood serum occurs when the solid cellular material in whole blood is precipitated out, leaving only the liquid portion called serum. When this serum is tested for alcohol a higher BAC often results as more alcohol is concentrated in the liquid serum. Thus, Appellant argues that the hospital's test of his blood serum should have been excluded as it did not accurately depict Appellant's level of intoxication at the time of either the testing or the accident. Additionally, Appellant notes that the definition of "alcohol concentration" in KRS 189A.005(1) does not include blood serum, and that a *Daubert* hearing was not held to determine the scientific validity of blood serum. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■ A trial judge's decision with respect to relevancy of evidence under KRE 401 and 403 is reviewed under an abuse of discretion standard. *Commonwealth v. English*, Ky., 993 S.W.2d 941, 945 (1999); *Barnett v. Commonwealth*, Ky., 979 S.W.2d 98 (1998). There was no abuse of discretion in admitting evidence that made a determination of Appellant's intoxication more probable than not. KRE 401. Appellant's concerns go to the weight of the evidence, not its admissibility. Both sides presented expert testimony as to BAC amplification in blood serum—anywhere from 10 to 35 percent. From this evidence, the jury could evaluate the results and determine what weight to give to the serum.[1]

Nor is it dispositive that KRS 189A.005(1) does not mention blood serum in the definition of "alcohol concentration." Like the urine sample discussed *supra*, the failure of the statute to mention blood serum does not render the evidence inadmissible. Nor do we need to determine whether a jury could find a defendant guilty under KRS 189A.010(1)(a) based solely on the BAC of his blood serum. It was permissible for the jury to consider this evidence when attempting to decide whether Appellant was driving a motor vehicle "under the influence of alcohol" under KRS 189A.010(1)(b).

■ Appellant's argument that the trial court was required to conduct a *Daubert* hearing with respect to the blood serum evidence was not preserved for appellate review. At trial, Appellant's objection to the evidence was premised upon relevancy, KRE 401, not scientific reliability, KRE 702. He did not assert that blood serum tests rest upon an unreliable foundation, *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2799, but that blood serum test results do not

accurately reflect the BAC necessary to convict under KRS 189A.010(1)(a) as evinced by the contradictory expert testimony on the subject. In fact, the word *"Daubert"* was never uttered during either the suppression hearing or the trial. At trial, Appellant offered his own expert witness on the subject of blood serum, and even he did not testify that blood serum testing was scientifically unreliable, but only that the test results would produce a higher BAC level than test results on whole blood. Additionally, numerous other jurisdictions allow the admission of blood serum evidence, without requiring a *Daubert* hearing, so long as the jury is provided appropriate whole blood conversion information. *See Domino's Pizza v. Gibson*, 668 So.2d 593 (Fla.1996); *People v. Green*, 294 Ill.App.3d 139, 228 Ill.Dec. 513, 689 N.E.2d 385 (1997); *Commonwealth v. Michuck*, *supra*, note 1; *Reidweg v. Texas*, 981 S.W.2d 399 (Tex.Crim.App. 1998).

### C. 500 KAR 8:030(2).

■ Appellant complains that the requirements of 500 KAR 8:030(2) were not complied with when the hospital drew blood from Appellant in accordance with its own procedures at 4:25 a.m. KRS 189A.103(1) and (3) provide that if a person is arrested for an offense arising out of a violation of KRS 189A.010(1) or KRS 189.520(1), a breath, blood or urine test may be administered at the direction of a peace officer and in accordance with administrative regulations. Appellant was not under arrest when the hospital drew his blood, and his blood was not drawn at the request or under the direction of a peace officer. Thus, the procedures required by 500 KAR 8:030(2)

---

1. A different result might be reached if no evidence was presented to the jury on the conversion rates between blood serum and whole blood. *See Commonwealth v. Michuck*, 454 Pa.Super. 594, 686 A.2d 403 (1996).

were not applicable. Love argues that he was in police custody, and cites to *Cook v. Commonwealth*, Ky., 826 S.W.2d 329 (1992) for the proposition that this is sufficient to trigger the requirements of KRS 189A.103 and 500 KAR 8:030(2). However, in *Cook*, hospital personnel admittedly drew the defendant's blood sample at the direction of a police officer. The issue in that case was whether the defendant had consented to the "search."

■■■ Appellant's argument that he was in police custody is based solely on the testimony of Officer Raymond Sutherland. After the accident, Officer Sam Cromity was dispatched to the hospital to learn the identity of the driver of the Thunderbird. Cromity asked Appellant if he had been the driver of the vehicle and Appellant answered affirmatively. Cromity then read Appellant his *Miranda* rights, which Appellant immediately invoked. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Cromity then ceased questioning Appellant and proceeded to obtain a search warrant. Officer Sutherland remained in the room while Cromity obtained the warrant. At trial, Sutherland opined that Appellant was "not in his custody, but was in police custody." If this were a Fifth Amendment issue, that statement might have some import. Under *Miranda*, a person is in custody when "deprived of his freedom of action in any significant way" by a law enforcement officer. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. However, the Fifth Amendment is not implicated by the taking of a blood sample. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). It is purely a Fourth Amendment inquiry. The Fourth Amendment "protect[s] personal privacy and dignity against unwarranted intrusion by the state." 384 U.S. at 767, 86 S.Ct. at 1834. Here, it was the

hospital that conducted the "search," not the state.

### D. State Action.

Along the same lines, Appellant argues that the hospital blood test is inadmissible because it is interwoven with state action, *i.e.*, Appellant was in police custody when the sample was drawn and tested. We reiterate that absent any evidence that the blood was drawn at the request or direction of the police, there was no "state action."

### III. THE SUSPENDED LICENSE.

■■■ One count of the indictment charged Appellant with operating a motor vehicle on a suspended license. KRS 186.620(2). Appellant stipulated to that fact out of the presence of the jury in order to avoid any prejudice stemming from proof of that fact. In this regard, Appellant also requested the court to admonish the jury not to consider driving on a suspended license as evidence of "extreme indifference to human life." KRS 507.020(1)(b). The trial court declined to give the proposed admonition. Appellant now claims it was error to refuse to give the admonition, to not exclude comments made by the prosecutor during closing arguments, and to not bifurcate the proceedings. Only the first claim was preserved.

The prosecutor did not equate driving on a suspended license with "extreme indifference to human life." KRS 507.020(1)(b). The prosecutor merely argued, several times, that Appellant knew he was driving on a suspended license. Remember, Appellant did not plead guilty to this crime; it was necessary for the jury to determine his guilt or innocence of that offense. Therefore, the prosecutor was entitled to discuss that charge during closing argument. The trial court was not required to give the requested admonition to the jury, especially since no effort was

made at trial to equate driving on a suspended license with extreme indifference to human life. Nor was the trial court required *sua sponte* to bifurcate the suspended license charge from the trial of the other offenses.

## IV. INSTRUCTIONS ON THIRD-DEGREE ASSAULT.

Appellant assigns error with respect to the instructions on assault in the third degree pertaining to two police officers, Matthew Glass and Bill Green. Appellant was convicted of third-degree assault only as to Officer Green; he was convicted of first-degree assault as to Officer Glass.

Pursuant to KRS 508.025(1)(a)1, a person is guilty of third-degree assault when he "[r]ecklessly, with a deadly weapon or a dangerous instrument, or intentionally causes or attempts to cause physical injury to ... [a] state, county, city, or federal peace officer." The offense is identical to fourth-degree assault, KRS 508.030, except that the victim's status as a peace officer enhances the offense from a Class A misdemeanor to a Class D felony. While KRS 508.025(1)(a)1 recites a culpable mental state with respect to the defendant's act and the result thereof (intent or recklessness), it does not recite a culpable mental state with respect to the enhancing element, *i.e.*, the status of the victim as a peace officer. Appellant tendered third-degree assault instructions that would have required the jury to find him guilty of that offense if he recklessly caused physical injury to the officers while they were acting in the course of their official duties *and if he knew they were so acting at the time of the offense.* *See* 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 3.47, at 114–15 (4th ed. Anderson 1993). Instead, the jury was instructed to find Appellant guilty of third-degree assault if he recklessly caused physical injury to the officers *while they were acting in the line of duty.* Thus, the instructions did not require a culpable mental state with respect to the status of the victims, but imposed absolute liability as to that element of the offense.

Per KRS 501.030(2), a person cannot be found guilty of a criminal offense unless that person "has engaged in such conduct intentionally, knowingly, wantonly or recklessly as the law may require, *with respect to each element of the offense,* except that this requirement does not apply to any offense which imposes absolute liability, as defined in KRS 501.050." (Emphasis added.) KRS 501.050 provides that a person may be guilty of an offense absent a culpable mental state only if the offense is a violation or a misdemeanor, or is defined by a statute outside the penal code. By its own terms, KRS 501.050 does not apply to the offense of assault in the third degree, which is a Class D felony and defined within the penal code. Thus, KRS 508.025(1)(a)1 cannot be interpreted as imposing absolute liability with respect to any element of the defined offense.

KRS 501.040 provides that "[a]lthough no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of such offense, *or with respect to some or all of the material elements thereof,* if the proscribed conduct necessarily involves such culpable mental state." (Emphasis added.) In *Covington v. Commonwealth,* Ky.App., 849 S.W.2d 560 (1992), the Court of Appeals addressed the validity of that portion of KRS 508.025(1)(b) which prohibits assaults by prisoners against detention facility employees. That section does not recite a culpable mental state with respect to either the defendant's conduct or the status of the victim. In *Covington,* there was no issue as to the defendant's knowledge

that the victim of his assault was a prison employee. The only issue was the defendant's *mens rea* with respect to his conduct. Citing KRS 501.040, the Court of Appeals held that, under the facts of that case, the defendant could be found guilty of third-degree assault only if he acted intentionally or wantonly with respect to his assault of the prison employee. *Id.* at 562.

Unlike *Covington*, Appellant's culpable mental state with respect to both his conduct and the status of his victims was at issue in this case. Pursuant to KRS 501.040, Appellant could not be convicted of assaulting a police officer absent knowledge on his part that his victim was a police officer. Illustrative of offenses requiring a culpable mental state with respect to the status of the victim are those defining sexual offenses against children in which the age status of the child is an enhancing element of the offense, *e.g.*, KRS 510.040(2) and KRS 510.070(2). It is a defense to those offenses that the defendant did not know the age status of the victim. KRS 510.030; *see also* KRS 531.330(2). Also illustrative is KRS 513.020(1)(a), which provides that arson in the first degree is committed when a person intentionally sets a fire or causes an explosion with the intent to destroy or damage a building and "[t]he building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied." Though the language of the statute does not require the accused to *know* the building is inhabited or occupied, the 1974 Commentary interprets the statute to require such knowledge on the part of the defendant.[2]

The issue then becomes what degree of knowledge is required? KRS 501.020(2) defines "knowingly" as follows:

> A person acts knowingly with respect to conduct or *to a circumstance* described by a statute defining an offense *when he is aware* that his conduct is of that nature or *that the circumstance exists.* (Emphasis added.)

The definition is modeled on § 2.02(2)(b)(i) of the Model Penal Code. The Model Code, however, contains the following additional provision:

> When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist.

Model Penal Code § 2.02(7) (1962). The original draft of the Kentucky Penal Code contained an identical provision, HB 197, 1972 Gen. Assem., Reg. Sess. § 15(3), but that provision was deleted from the final draft and no substitute was provided. R. Lawson, *Kentucky Penal Code: The Culpable Mental States and Related Matters,* 61 Ky. L.J. 657, 664 (1972–73). Thus, nothing short of actual knowledge will suffice to sustain a conviction. However, Professors Lawson and Fortune point out in their treatise that "proof of circumstances that would cause a reasonable person to believe or know of the existence of a fact is evidence upon which a jury might base a finding of full knowledge of the existence of that fact." R. Lawson and W. Fortune, *Kentucky Criminal Law,* § 2–2(c)(1), at 45 (LEXIS 1998). In other words, though actual knowledge is required, proof of actual knowledge can be by circumstantial evidence. That proposition mirrors the holding of the pre-code case of *Ellison v.*

---

2. There is no Commentary to KRS 508.025 since that statute was not a part of the original penal code, but was enacted by the 1982 General Assembly. 1982 Ky. Acts, ch. 429, § 1.

*Commonwealth*, 190 Ky. 305, 227 S.W. 458, 461 (1921).

Appellant did not testify at trial; thus, it is unknown whether he was actually aware of the group of people huddled around the injured Vinson on the east side of the wrecked minivan, or that the group included two police officers. However, two police cruisers were parked in plain view, one in the middle of the expressway, both with lights flashing. That evidence was sufficient to create an issue for the jury as to whether Appellant actually knew that police officers were on the scene and endangered by his wanton conduct. That issue should have been presented to the jury by instructions requiring the jury to believe beyond a reasonable doubt that Appellant knew that his potential victims included peace officers. The error was harmless as to Glass, because the jury found beyond a reasonable doubt that Glass sustained a serious physical injury, a finding which enhanced Appellant's offense as to him from third-degree assault to first-degree assault and rendered his status as a peace officer immaterial.[3] KRS 508.010(1). However, Appellant's conviction of third-degree assault of Green must be reversed for a new trial at which the jury shall be instructed as an element of the offense that Appellant can be convicted of third-degree assault only if he knew at the time of the assault that Green was a peace officer.

## V. EVIDENCE OF THE FIRST ACCIDENT.

On January 29, 1999, Appellant filed an objection to consolidating his trial with that of William Shaw, the driver who was at fault in the first accident and who was subsequently indicted for several of the same offenses. Appellant successfully prevented the consolidation of the two trials; however, he now complains that the trial court impermissibly precluded him from introducing evidence of Shaw's culpability at his (Appellant's) trial. Specifically, Appellant wanted to introduce evidence that Shaw was indicted for some of the same offenses and that Shaw was drunk when he improperly merged onto Watterson Expressway and caused the first accident. The trial court ruled this evidence was irrelevant to the issue of Appellant's guilt or innocence. We agree.

A trial court's decision on a relevancy issue is reviewed under an abuse of discretion standard. *Commonwealth v. English, supra,* at 945. KRE 401 states " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, neither the fact that Shaw was drunk when he started the series of events leading up to Appellant's accident nor the fact that Shaw was later indicted for similar offenses makes Appellant's own guilt more or less probable. The jury was advised of the most salient fact with regard to Shaw's involvement, *i.e.,* that the victims of Appellant's conduct were present in the expressway because another accident had occurred just prior to Appellant reaching the scene.

## VI. SUFFICIENCY OF THE EVIDENCE.

Appellant argues that the Commonwealth did not adduce sufficient

---

**3.** Since a lesser included offense is, in fact and principle, a defense against the higher charge, *Coffey v. Messer,* Ky., 945 S.W.2d 944, 946 (1997), an erroneous instruction on a lesser included offense can be grounds for reversal even if the defendant was convicted of the higher offense. *E.g., Casey v. Commonwealth,* Ky., 313 S.W.2d 276 (1958). However, while proof of recklessness would be a defense to first-degree assault, proof that the victim was a peace officer would not.

evidence to prove wanton murder under circumstances exhibiting extreme indifference to human life. The standard of review is that set forth in *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991). There, we stated that "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* at 187. A review of the evidence as a whole shows that it was not unreasonable for a jury to find Appellant guilty of wanton murder. KRS 507.020(1)(b) states:

> (1) A person is guilty of murder when:
>
> . . .
>
> (b) Including, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.

KRS 501.020(3) states wanton conduct occurs when a person "is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

Appellant was speeding; he was intoxicated; and, most tellingly, he did not slow down or attempt to stop upon seeing a police car blocking the road. Instead he attempted to swerve around the police car while traveling a reported seventy to ninety miles an hour. This conduct exhibited the aggravated wantonness described in KRS 507.020(1)(b) and was sufficient evidence to support Appellant's conviction of wanton murder. *Estep v. Commonwealth,* Ky., 957 S.W.2d 191 (1997); *Walden v.* *Commonwealth,* Ky., 805 S.W.2d 102 (1991), *overruled on other grounds, Commonwealth v. Burge,* Ky., 947 S.W.2d 805 (1996); *Hamilton v. Commonwealth,* Ky., 560 S.W.2d 539 (1977).

## VII. PREJUDICIAL PHOTOGRAPHS AND STATEMENTS.

■ The Commonwealth, in its case in chief, portrayed the life of U.S. Army soldier Ochs as a hero who stopped to render assistance and who was senselessly killed. In this regard, the Commonwealth introduced three photographs of Ochs. One was a large professional photograph of Ochs in his army uniform. The other two showed Ochs's uncovered body at the accident scene. Finally, one witness, Otis Mason, testified that Ochs had pushed him out of the path of Love's vehicle. Only the admission of the life photograph was objected to at trial. Appellant seeks review of the other two matters under RCr 10.26 for palpable error.

The thrust of Appellant's argument is that the photographs and testimony are irrelevant and unduly prejudicial. However, we have held many times that life photographs and testimony concerning a victim are admissible to remind "the jury that the victim was once a living person and not just a statistic." *Templeman v. Commonwealth,* Ky., 785 S.W.2d 259, 261 (1990); *Talbott v. Commonwealth,* Ky., 968 S.W.2d 76 (1998); *Bussell v. Commonwealth,* Ky., 882 S.W.2d 111 (1994), *cert. denied,* 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995); *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519, 523 (1984), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). This situation is no different.

■ Neither of the unpreserved claims of error resulted in manifest injustice. The general rule is that a photo-

graph "does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk v. Commonwealth*, Ky., 842 S.W.2d 476, 479 (1992); *see also Brown v. Commonwealth*, Ky., 934 S.W.2d 242 (1996). Nor was the testimony of Mason impermissibly prejudicial. He was merely testifying to the fact that Ochs apparently sacrificed his own life to save Mason.

## VIII. APPELLANT'S INFLAMMATORY STATEMENTS.

Finally, Appellant argues that the trial court erred in admitting certain derogatory statements Appellant directed towards a police officer and the phlebotomist. Neither is preserved and neither gives rise to palpable error.

Accordingly, Appellant's conviction and sentence for the third-degree assault of Officer Bill Green is reversed for a new trial in accordance with this opinion; in all other respects, the judgments of conviction and sentences imposed upon Appellant by the Jefferson Circuit Court are affirmed.

LAMBERT, C.J., JOHNSTONE, KELLER and STUMBO, JJ., concur.

WINTERSHEIMER, J., concurs in part and dissents in part by separate opinion in which GRAVES, J., joins.

WINTERSHEIMER, Justice, Concurring in Part and Dissenting in Part.

I concur in the majority opinion insofar as it affirms the conviction and sentences. However, I must respectfully dissent from that part of the opinion which reverses the conviction and sentence for third-degree assault and orders a new trial.

Love claims error in regard to the third-degree assault instruction given for the injury caused to two police officers. The instructions given by the trial judge only required the jury to find that Love recklessly caused physical injury to the officers while they acted in the line of duty.

KRS 508.025 provides that a person is guilty of third-degree assault when he recklessly with a deadly weapon or dangerous instrumentality, or intentionally causes or attempts to cause physical injury to . . . a state, county, city or federal peace officer. The statute does not require that the defendant knew the status of the victim at the time of the assault, but only that the defendant acted recklessly or intentionally in that the injured victims were peace officers. Essentially, KRS 508.025 enhances what would otherwise be an assault in the fourth degree to a felony because of the status of the victim as a member of law enforcement. The statute is similar to those involving sexual offenses against children in which the offense is enhanced, depending on the age of the child, as an example, KRS 510.040(2) and KRS 510.070(2).

In the case of KRS 508.025, there is no defense of lack of knowledge included in the statutory language and it is not interpreted by any commentary. Here, two police cruisers were parked in plain view, both with lights flashing and one parked in the middle of the expressway. It is interesting to note that the original draft of the Kentucky Penal Code contained a provision requiring knowledge, but it was deleted from the final draft. Clearly, the General Assembly did not wish to include the knowledge question.

The conviction should be affirmed in all respects.

GRAVES, J., joins this opinion.