Joey MEADOWS, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2003–CA–002482–MR.

Court of Appeals of Kentucky.

June 3, 2005.

As Modified July 8, 2005.

Discretionary Review Denied by Supreme Court Dec. 14, 2005.

Julia K. Pearson, Frankfort, KY, for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General, Frankfort, KY, for Appellee.

Before MINTON and TACKETT, Judges; HUDDLESTON, Senior Judge.[1]

## OPINION

MINTON, Judge.

### INTRODUCTION

Joey Meadows was charged with first-degree rape,[2] first-degree unlawful imprisonment,[3] and two counts of first-degree sodomy.[4] A jury found him guilty of first-degree sexual abuse[5] (a lesser included offense of first-degree rape), first-degree unlawful imprisonment, and one count of first-degree sodomy. The jury found him not guilty of the remaining count of first-degree sodomy. Meadows then waived sentencing by the jury. The circuit court sentenced him to a maximum of fifteen years' imprisonment.[6]

Meadows brings a direct appeal of his judgment of conviction. He asserts three errors by the trial court: failing to instruct the jury on fourth-degree assault,[7] allowing Dr. William Smock to testify as an expert witness regarding a bite mark on Meadows's penis, and allowing Dr. Russell Compton to testify about T.H.'s account of

1. Senior Judge Joseph R. Huddleston sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

2. Kentucky Revised Statutes (KRS) 510.040.

3. KRS 509.020.

4. KRS 510.070.

5. KRS 510.110.

6. The October 20, 2003, Judgment of Conviction and Sentence sentenced Meadows as follows: "five (5) years for Sexual Abuse in the First Degree; ten(10) years for Sodomy in the First Degree; and five (5) years [for] Unlawful Imprisonment in the First Degree, for a total of FIFTEEN (15) YEARS." Capitalization as in original, emphasis omitted. It is unclear from the order which sentences are to run concurrently and which are to run consecutively in order to reach the total of fifteen years' imprisonment. However, no one has raised this issue on appeal.

7. KRS 508.030.

the sexual assault and to give his expert opinion that T.H.'s injuries were consistent with her account. Finding no reversible error, we affirm.

### CONTACT BETWEEN MEADOWS AND T.H.

After spending some time with Jennifer and Corey McDonald and Meadows in the McDonalds's home, T.H. decided to spend the night there. She had come to the McDonalds' home with Meadows, who is also Jennifer's brother, after meeting him in a bar a few hours earlier. Meadows also was staying with the McDonalds. T.H. borrowed pajamas from Jennifer and went to sleep alone in the bedroom to which Jennifer had taken her.

At this point, the accounts of T.H. and Meadows, both of whom testified at trial, diverge. According to T.H., she did not know that the bedroom Jennifer escorted her to was also the same bedroom where Meadows planned to sleep. She testified that she woke up to find that Meadows had removed her pajama bottoms and was on top of her. He was penetrating her vagina with his penis and touching her breast. She resisted, struggling and kicking. He then switched to performing oral sex on her. After more resistance by T.H., Meadows pinned her arms, grabbed her chin, and forced his penis into her mouth. Later, he again attempted sexual intercourse.

T.H. asserted that Meadows forced all of these sexual acts upon her. He pinned her down and physically restrained her. She struggled and kicked and bit Meadows at least once. Meadows repeatedly hit her in the head, choked her, and held or dragged her by her hair. He threatened to rape her anally if she were not cooperative. He once held a pillow over her head and, on multiple occasions, threatened to kill her by breaking her neck or strangling her if she awakened anyone. He added impact to these death threats by telling her that he knew how to kill people because he was trained as a Marine. T.H. was finally able to escape when he fell asleep.

Meadows testified that he and T.H. never discussed where he was to sleep because it was understood that they would sleep together. Moreover, he said that she should have known that it was his bedroom since it was a three-bedroom house and the McDonalds and their baby occupied the other two bedrooms. He stated that when he went to bed, he and T.H. engaged in consensual foreplay, which included him penetrating her vagina with his finger. Then, of her own initiative, T.H. began performing fellatio on him. In the process, she accidentally injured his penis with her teeth, causing it to bleed, which made her laugh. Meadows went to the bathroom to check out the injury. The injury and T.H.'s laughter caused Meadows to lose desire for further sexual contact. At that point, he and T.H. just went to sleep. He testified that all of the sexual contact was consensual. He denied ever engaging in sexual intercourse or cunnilingus with T.H. He also denied that he ever struck T.H., threatened her, or prevented her from leaving. Other relevant facts will be set forth as needed.

### JURY INSTRUCTION ON FOURTH–DEGREE ASSAULT

█ The trial court instructed the jury on two lesser included offenses of first-degree rape: first-degree sexual abuse and sexual misconduct.[8] In fact, Meadows was convicted of first-degree sexual abuse rather than first-degree rape. But Meadows

8. KRS 510.140.

asserts that the trial court erred by denying his request for an additional jury instruction on fourth-degree assault. He preserved this issue for review under RCr[9] 9.54(2)[10] by tendering a jury instruction for fourth-degree assault and by arguing to the trial court that he was entitled to this instruction as a lesser included offense of first-degree rape.

■ William S. Cooper's *Kentucky Instructions to Juries*, does not list fourth-degree assault among the lesser included offenses of first-degree rape by forcible compulsion,[11] raising the question of whether it is a lesser included offense of first-degree rape. The mere "fact that the evidence would support a guilty verdict on a lesser uncharged offense does not establish that it is a lesser included offense of the charged offense."[12] It might simply be an uncharged offense.

Of the four possible ways set forth in KRS 505.020(2) by which an uncharged lesser offense can be included within a charged offense, only the following might apply in the instant case: "[the offense] is established by proof of the same or less than all the facts required to establish the commission of the offense charged."[13]

Fourth-degree assault requires proof of "physical injury."[14] But physical injury is not an element of rape.[15] The Kentucky Supreme Court has held that second-degree assault is not a lesser included offense of first-degree rape precisely because physical injury is an element of the former offense but not the latter.[16] The same reasoning would apply to fourth-degree assault. Also, when it is not based on the use of a deadly weapon or dangerous instrument,[17] fourth-degree assault requires proof that the defendant acted "intentionally or wantonly" in causing the physical injury.[18] In contrast, the statute for first-degree rape does not require any particular state of mind, such as intent or knowledge.[19] Because fourth-degree assault cannot be established by proof of the same facts or less than all of the facts

---

9. Kentucky Rules of Criminal Procedure.

10. RCr 9.54(2) dictates that a party may not designate as error the failure to give an instruction unless one of the following occurs: "the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection."

11. § 4.23 cmt. (1999). This treatise refers to first-degree rape by forcible compulsion to distinguish KRS 510.040(1)(a) which punishes sexual intercourse by forcible compulsion from KRS 510.040(1)(b) which punishes sexual intercourse with a person who is incapable of consent because he or she is physically helpless or less than twelve (12) years old. Meadows's rape charge was based on the use of forcible compulsion.

12. *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky.1998).

13. KRS 505.020(2)(a).

14. *See* KRS 508.030.

15. *Wager v. Commonwealth*, 751 S.W.2d 28, 30 (Ky.1988), *Van Dyke v. Commonwealth*, 581 S.W.2d 563, 565 n. 1 (Ky.1979). *See also*, KRS 510.040.

16. *See Wager*, 751 S.W.2d at 30.

17. *See* KRS 508.030(1)(b). Meadows was not accused of using any deadly weapon or dangerous instrument.

18. KRS 508.030(1)(a).

19. *Malone v. Commonwealth*, 636 S.W.2d 647, 647–648 (Ky.1982) (holding that the voluntary intoxication is no defense to first-degree rape because the defendant's *mens rea* is not an element of the crime). *See also*, KRS 510.040.

needed to establish first-degree rape, it cannot be a lesser included offense of first-degree rape.

■■■■ Even if it were a lesser included offense, Meadows was not entitled to an instruction on fourth-degree assault. A trial court is required to instruct on every theory of the case that can reasonably be supported by the evidence,[20] but there is no duty to instruct on a theory that lacks an evidentiary foundation.[21] An instruction on a lesser included offense is required only if "the jury might have a reasonable doubt as to the defendant's guilt of the greater offense[ ] and yet believe beyond a reasonable doubt that he is guilty of the lesser offense" based on the evidence as a whole.[22] No special jury instruction is required where the "negative [of the submitted instruction] completely covers the defense of the accused."[23]

Meadows asserts that he was entitled to an instruction on fourth-degree assault on the ground that the jury could believe that T.H. and Meadows engaged in consensual fellatio but that he physically assaulted her after she accidentally injured his penis and laughed about doing so. But this theory is not supported by the evidence presented at trial. Meadows's defense to the rape charge was that no sexual intercourse ever occurred and that he never forcibly compelled her to do anything. This defense was adequately presented by the first-degree rape instruction since it is simply that instruction's negative.[24]

Even if there were evidence to support the theory that Meadows physically assaulted T.H. after she bit his penis, this would just be evidence of an uncharged assault not a lesser included offense of the rape charge. The evidence does not support an instruction on fourth-degree assault even if it were a lesser included offense of first-degree rape.

■■■■ Meadows asserts that he was entitled to an instruction on fourth-degree assault even if it were not a lesser included offense of first-degree rape because it was crucial to his defense theory. A defendant is "entitled to an instruction on his theory of the case, even if it is an alternative theory as opposed to a lesser included offense."[25] Thus, the Kentucky Supreme Court held that if any substantial evidence is presented to support a defendant's defense theory that the alleged acts upon which charges of first-degree rape, first-degree sodomy, and kidnapping were based all occurred after the victim had been murdered, the defendant is "entitled upon request to instructions [on the crime of abuse of a corpse] accordingly, rather than the jury being left with no alternative except to convict or acquit of the principal charges."[26]

■■■■ But Meadows has not preserved this issue. At trial, he requested the fourth-degree assault instruction solely on the basis that it was a lesser included offense of the rape charge. Having given a specific reason for his objection to the

**20.** *Ragland v. Commonwealth*, 421 S.W.2d 79, 81 (Ky.1967).

**21.** *Houston*, 975 S.W.2d at 929. *See Smith v. Commonwealth*, 599 S.W.2d 900, 905 (Ky. 1980) (holding that "[i]nstructions in a criminal prosecution must have a source within the framework of the evidence introduced at the trial.").

**22.** *Houston*, 975 S.W.2d at 929.

**23.** *Blevins v. Commonwealth*, 258 S.W.2d 501, 502–503 (Ky.1953).

**24.** *See Id.*

**25.** Cooper, § 1.04(C).

**26.** *Sanborn v. Commonwealth*, 754 S.W.2d 534, 549–550 (Ky.1988).

trial court's failure to instruct on the fourth-degree assault charge, he may not now raise a different ground.[27] Regardless, this claim is without merit. A trial court is not required to instruct on a defendant's alternate defense theory unless substantial evidence to support that theory has been presented. No such evidence was presented in this case. Moreover, unlike Sanborn's defense, Meadows's defense to the crime of rape is simply the negative of the instruction. Therefore, no additional instruction was required.[28] For all of these reasons, we find no error in the trial court's refusal to instruct the jury on fourth-degree assault.

### DR. SMOCKS'S TESTIMONY

■ Meadows asserts that the trial court erred by admitting expert testimony by Dr. William Smock that Meadows had a bite mark on his penis that was the result of a bite of considerable pressure. The ultimate decision on whether to admit expert testimony is subject to review for abuse of discretion.[29] Meadows asserts that the trial court abused its discretion because Dr. Smock did not meet the requirements set forth in *Stringer v. Commonwealth*[30] governing the admissibility of expert witness evidence. In *Stringer,* the Kentucky Supreme Court held that such evidence is admissible so long as the following conditions are met:

(1) the witness is qualified to render an opinion on the subject matter, (2) the subject matter satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), (3) the subject matter satisfies the test of relevancy set forth in [Kentucky Rules of Evidence (KRE)] 401, subject to the balancing of probativeness against prejudice required by KRE 403, and (4) the opinion will assist the trier of fact per KRE 702.[31]

Meadow has asserted that Dr. Smock's testimony did not meet any of these four conditions.

Dr. Smock examined Meadows in the emergency room of the University of Louisville Hospital (University Hospital) in the afternoon following Meadows's contact with T.H.[32] The police had requested that a clinical forensic examination of Meadows be performed. But Meadows also asked to be treated for a bite wound to his penis. Dr. Smock examined Meadows for both purposes.

Dr. Smock testified that Meadows had an abrasion on the top glans, or head, of the penis and a semicircular contusion, or bruise, on the lower glans of the penis. Also, blood was coming from Meadows's urethra. These wounds and the blood were documented by photographs. When he asked Meadows how he was injured, Meadows told him that he was bitten during consensual oral sex by a woman he met at a bar. Dr. Smock gave his expert opinion that the physical findings were consistent with Meadows's account of suffering a bite to the penis. He cleaned the wound and prescribed an antibiotic. Dr. Smock wanted to examine Meadows's urethra because of the presence of blood, which he indicated was likely caused by a tearing of

---

**27.** *Wright v. Premier Elkhorn Coal Co.,* 16 S.W.3d 570, 571 (Ky.App.1999).

**28.** *See Blevins,* 258 S.W.2d at 502–503.

**29.** *Fugate v. Commonwealth,* 993 S.W.2d 931, 935 (Ky.1999).

**30.** 956 S.W.2d 883 (Ky.1997).

**31.** *Id.* at 891.

**32.** Meadows was escorted by police to the emergency room but apparently had not yet been arrested.

the vascular walls inside the urethra due to the pressure of the bite. Meadows refused to permit Dr. Smock or the urologist to examine the urethra.

Dr. Smock did not attempt to identify who made the bite based on the bite mark. He conceded that he could not determine whether the bite was intentional or accidental based upon the appearance of the bite mark. Regarding the force used, he could only say that a considerable amount of force would be required to break the skin and damage the blood vessels in the urethra. He could not specify whether the bite mark was the result of a single bite or multiple bites in exactly the same location, although he deemed the latter less likely.

It might appear at first blush that any error in admitting Dr. Smock's expert opinion testimony identifying the wound on Meadows's penis as a bite mark is harmless *per se*. Detective Eddie Robinson testified that Meadows had said that T.H. accidentally injured his penis with her teeth during consensual oral sex but that he had downplayed the seriousness of the injury. Meadows similarly testified that the wound occurred accidentally during consensual oral sex. Meadows also did not object to Dr. Smock's testifying about Meadows's earlier admission to this effect. However, because Dr. Smock's description of the bite mark and the pressure needed to puncture the skin and tear the blood vessels inside the urethra might tend to weigh against Meadows's claim that the wound occurred accidentally during consensual oral sex, we will review the merits of this issue.

■ Meadows first asserts that Dr. Smock was not qualified to present expert testimony on the nature of the wound and how it was likely made. Whether a witness is qualified as an expert is a factual determination and is reviewed for clear error.[33] The trial court conducted a hearing outside the presence of the jury on this issue, ultimately ruling that Dr. Smock is qualified as an expert on bite marks.

Dr. Smock is the head of the emergency medicine department at University Hospital. He is board-certified in emergency medicine and has also completed an additional year of training in clinical forensic medicine.[34] He is an associate professor of emergency medicine at University of Louisville and teaches emergency medicine and clinical forensic medicine.

Dr. Smock has lectured and written extensively on clinical forensic medicine including pattern injuries. He described the study of pattern injuries as a recognized field of clinical forensic medicine concerning matching an injury with the object causing the injury. Bite marks are considered a type of pattern injury. Dr. Smock has actually written on identifying bite marks and instructs his students in clinical forensic medicine on diagnosing and treating bite marks.

Dr. Smock testified that he has evaluated hundreds of bite marks in both living and deceased[35] persons. Specifically, he has evaluated numerous penile bites. He has also received some additional training on bite marks from a Louisville-area dentist who is a practicing forensic

---

**33.** *Bratcher v. Commonwealth*, 151 S.W.3d 332, 353 (Ky.2004), Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 6.20[6], at 456 (4th ed.2003).

**34.** Dr. Smock described clinical forensic medicine as that branch of forensic medicine which focuses on living patients.

**35.** He completed his year of clinical forensic training at the Kentucky Medical Examiner's Office.

dentist. Forensic dentists are experts on identifying persons based on unique characteristics of their teeth, which may include determining the identity of an unknown deceased person based on dental records, determining the age of a person based on his or her teeth, and determining who made a bite based on an analysis of the bite mark and the suspect's teeth.

In spite of Dr. Smock's credentials, Meadows still asserts that he is not qualified to make a bite mark identification because he is not a dentist and, therefore, not qualified in the field of forensic dentistry to determine whether T.H. made the bite on Meadows's penis. This is a contrived argument since Dr. Smock never attempted to identify who bit Meadows based on the bite mark. The real issue is whether Dr. Smock is qualified as an expert to distinguish a bite mark from any other type of wound and to testify to the extent of the injury.

The Kentucky Supreme Court ruled in *Wheeler v. Commonwealth*[36] that a physician pathologist was qualified as an expert witness to testify whether a wound on a victim's arm was a bite mark.[37] Thus, the fact that Dr. Smock is a medical doctor and not a forensic dentist is not dispositive. Dr. Smock's specialized training in clinical forensic medicine and pattern identification, including recognizing and treating bite marks, and his vast personal experience evaluating and treating bite marks make him eminently qualified to recognize a bite mark. The trial court did not abuse its discretion in determining that Dr. Smock was qualified to offer expert opinion testimony on the nature of the injury to Meadow's penis.

Meadows also asserts that bite mark analysis did not satisfy the *Daubert* test because forensic dental identification—identifying a biter based on the bite mark he or she left behind—has not been empirically tested, is somewhat subjective, and has a high error rate even by highly trained forensic dentists. At trial, Meadows cursorily asserted that there was no scientific foundation for forensic dentistry and identification by bite mark; but he did not press for a *Daubert* hearing when none was conducted. It was clear that the focus of the hearing conducted by the trial court was Dr. Smock's qualification to testify about bite mark evidence, not whether the science behind his testimony was sound. By failing to object timely, Meadows has failed to preserve this issue for judicial review.[38]

Even if this issue were preserved, it is without merit because it is based on the mistaken premise that Dr. Smock identified the person who bit Meadows based on the bite mark. Attacking this type of dental forensic identification does nothing to call into question the study of pattern injuries that formed the basis of Dr. Smock's expert testimony that Meadows's wound was a bite mark. Meadows also cited two isolated cases from other jurisdictions in which different forensic dentists reached different conclusions on whether particular marks were bite marks. If the mere existence of a dispute between experts on the existence of a particular fact were fatal, no expert testimony would be admitted under *Daubert*.

Meadows also asserts that Dr. Smock's testimony is inadmissible because

**36.** 121 S.W.3d 173 (Ky.2003).

**37.** *Id.* at 183 (Ky.2003).

**38.** *See Love v. Commonwealth,* 55 S.W.3d 816, 822 (Ky.2001) (holding that appellant failed to preserve the issue of whether a *Daubert* hearing was required by never requesting one nor timely objecting to the trial court's failure to conduct one).

it is not relevant as defined by KRE 401 and does not pass the balancing test under KRE 403, which permits relevant evidence to be excluded, among other reasons, "if its probative value is substantially outweighed by the danger of undue prejudice...." Meadows asserts that Dr. Smock's testimony is not relevant because it is based on junk science; but this conclusion is based on the flawed premise that Dr. Smock identified who bit Meadows based on the characteristics of the bite mark, a practice of forensic dentistry which Meadows asserts is lacking in scientific validity. Moreover, Meadows admits that this evidence supported T.H.'s story of sexual assault, in effect, conceding its relevance.

■ Meadows further asserts that the expert witness testimony by Dr. Smock "should have been excluded as more prejudicial than probative" because Dr. Smock "provided the evidence to support T.H.'s story of forced sexual relations," specifically one count of sodomy. But Meadows misapplies the test of KRE 403. The test is not whether the probative value is outweighed by the danger of prejudice but, rather, whether the probative value is *substantially* outweighed by the danger of *undue* prejudice. As Meadows himself concedes, this testimony is relevant to the count of sodomy based on Meadows's attempt to force T.H. to perform fellatio. The fact that Meadows has an alternative explanation that also might account for the bite mark—that it happened accidentally during consensual oral sex—lessens any possible prejudice. Because the danger of undue prejudice is not substantially outweighed by the probative value of the evidence, the trial court did not err in admitting Dr. Smock's expert opinion evidence identifying the wound on Meadows's penis as a bite mark inflicted by a bite of considerable pressure.

Meadows also asserts that Dr. Smock's opinion did not serve to assist the jury, as required by KRE 702, but, rather, to confuse it. But his real complaint here is not that it confused the jury but, rather, that it provided additional support for T.H.'s version of sexual assault. The fact that Dr. Smock's expert testimony is relevant or persuasive does not make it confusing. Meadows's only other basis for saying that it confused the jury lies in his continuing assertion that Dr. Smock is unqualified to identify the biter, · a contention we have already discussed.

### DR. COMPTON'S TESTIMONY

Meadows also objected to the trial court's allowing Dr. Russell Compton to relate T.H.'s account of the sexual assault and the events leading up to it and to give his expert opinion that T.H.'s injuries were consistent with this account.

Dr. Compton examined T.H. when she came in to the emergency room of University Hospital at approximately 2 p.m. on March 4, 2002, alleging that she has been sexually assaulted earlier. Dr. Compton testified that he first talked with T.H. to establish a rapport; then performed an external examination; and, finally, performed a sexual assault examination. He testified that T.H. had bruises in the following locations: over her left eyebrow and eyelid; left shoulder/chest area; right middle arm; left upper arm; right inner thigh; left outer thigh; and neck. Her neck had both linear bruises on one side and smaller bruises caused by significant pressure. She also had multiple abrasions on her right forearm and linear abrasions radiating out from her vagina.

■ Dr. Compton also delivered an uninterrupted monologue lasting almost three-and-a-half minutes recounting everything that T.H. told him about the sexual assault and the events leading up to it.

KRE 803(4) sets forth a hearsay exception for "[s]tatements made for purposes. of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis." Statements by T.H. concerning how she was struck, pinned down, choked, and forcibly penetrated are obviously relevant to describing the inception or cause of her injuries and relevant to treatment or diagnosis. And it was not error to admit Dr. Compton's retelling of these statements.

■ But Dr. Compton's testimony also included many hearsay statements which would not be admissible under KRE 803(4) because they were not made for the purpose of medical treatment. Such statements included, for example, Meadows's name, the bar where he and T.H. met, what they did at the bar, where they went after they left the bar, and what he said to her during the sexual assault. Notably, Meadows never objected to this testimony. In fact, on cross-examination, Meadows pursued this line of testimony by asking follow-up questions which would require additional answers based on inadmissible hearsay.[39] Thus, this error is not preserved for judicial review. Even if we were to consider this error, we would deem the admission of this evidence to be harmless error. Meadows conceded that the impermissible hearsay testimony was cumulative of other evidence. And the

admission of inadmissible hearsay testimony that is cumulative is harmless error.[40]

Meadows did object to part ·of Dr. Compton's testimony: his expert opinion testimony that T.H.'s physical injuries were "consistent with" her account of the sexual assault. Dr. Compton specifically stated that the bruises on her neck were consistent with being choked, the bruises on her body were consistent with being forcibly restrained and pinned down, and the linear abrasions radiating from her vagina were consistent with blunt force trauma that could result from forcible sexual intercourse.

■ Meadows asserts that Dr. Compton's testimony that T.H.'s injuries were consistent with the events of the sexual assault as she described them "leads inextricably ... to a conclusion that [she] was telling the truth, thus she was raped and Joey Meadows was the culprit." He asserts that this was improper expert opinion testimony on the ultimate issue of guilt. Meadows cites *Newkirk v. Commonwealth*[41] for the proposition that such testimony is barred: "[W]here the determination of credibility is synonymous with the ultimate fact of guilt or innocence, expert opinion is inadmissible." [42] But Meadows fails to consider that the Kentucky Supreme Court more recently held in *Stringer v. Commonwealth*[43] that it was "depart[ing] from the 'ultimate issue' rule." [44] The Court explained as follows:

The real question should not be whether the expert has rendered an opinion as to

---

**39.** On cross-examination, Meadows asked Dr. Compton whether T.H. stated whose bed she went to sleep in that night and what she and Meadows bought at Wal–Mart after they left the bar but before they went to his sister's house.

**40.** *See White v. Commonwealth,* 5 S.W.3d 140, 142 (Ky.1999), *Patterson v. Commonwealth,* 555 S.W.2d 607, 609 (Ky.App.1977).

**41.** 937 S.W.2d 690 (Ky.1996).

**42.** *Id.* at 694.

**43.** 956 S.W.2d 883.

**44.** *Id.* at 891.

the ultimate issue, but whether the opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue." Generally, expert opinion testimony is admitted when the issue upon which the evidence is offered is one of science and skill and when the subject matter is outside the common knowledge of jurors. Presumably, jurors do not need assistance in the form of an expert's opinion that the defendant is guilty or not guilty. However, they usually do need the assistance of a medical expert in determining the cause of a physical condition in order to understand the evidence and determine the ultimate fact in issue.[45]

At issue in *Stringer* was whether the trial court properly admitted a gynecologist's testimony in a child sexual abuse case that his physical findings from a vaginal exam of the alleged victim were consistent with something being inserted into the victim's vagina and consistent with the history of sexual abuse which she gave the doctor.[46] The Supreme Court held that this was not the equivalent of testimony that the defendant was guilty but, rather, testimony relevant to determining that the ultimate fact at issue was more probable.[47] Because the Court determined that the opinion "concerned a subject peculiarly within the knowledge of a trained physician and was likely to assist the jury in determining whether [the alleged victim] had been sexually abused" by the defendant, it held that the testimony was admissible.[48] We can find no meaningful distinction between the testimony at issue in *Stringer* and Dr. Compton's testimony that his physical findings regarding T.H. were consistent with the history of sexual assault which

she recounted to him. Therefore, we hold that the trial court did not err in admitting this evidence.

## DISPOSITION

Having determined that Meadows has not identified any reversible error or abuse of discretion by the trial court, we affirm his judgment of conviction.

ALL CONCUR.

---

**45.** *Id.* at 889–890 (quoting KRE 702, citations omitted).

**46.** 956 S.W.2d at 889.

**47.** *Id.* at 891.

**48.** *Id.* at 892.